**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| **REDHAWK MEDICAL PROD. & SERVS. LLC** | **CIVIL DOCKET NO. 6:23-cv-1021** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **N95 SHIELD, LLC** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## ORDER AND JUDGMENT

Before the Court is a MOTION TO CONFIRM ARBITRATION AWARD (the "Motion") [Doc. 45] filed by Plaintiff Redhawk Medical Products & Services, LLC's ("Redhawk"). The Motion is opposed by Defendant N95 Shield, LLC (hereinafter "N95 Shield") [Doc. 49]. After careful consideration, and for the following reasons, Redhawk's Motion is GRANTED.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This lawsuit arises from the purchase by N95 Shield of 500 million PPE products (3M Masks) from Redhawk for a total purchase price of $950 million pursuant to a Sales and Purchase Agreement (the "Agreement") executed on June 22, 2021, by Matt Miller, CEO of N95 Shield, and Darcy Klug, CEO of Redhawk. The Agreement describes the product purchased [Doc. 30-1, ¶1]; the purchase price [Doc. 30-1, ¶2]; the procedures for the transfer of funds and release of the product [Doc. 30-1, ¶3]; the occurrences giving rise to a default under the Agreement [Doc. 30-1, ¶10]; and the remedies available to both parties in the event of a failure to cure a default [Doc. 30-1, ¶11].

The Agreement mandates arbitration in the event of a dispute arising out of the contract, as follows:

> **25.** **Arbitration of Disputes:** If a claim or controversy arising out of or relating to this Agreement, the performance or non-performance of obligations, the quality or appropriateness of the Products, such dispute shall be determined by final and binding arbitration…The arbitration will be conducted at a location determined by the Arbitrator in Louisiana…In rendering the award, the arbitrator shall determine the rights and obligations of the Parties according to the substantive and procedural laws of Louisiana. Neither Party, however, will be precluded from obtaining provisional relief, including but not limited to attachment, in any court of competent jurisdiction. Judgment may be entered upon the arbitrator's award by any court having jurisdiction. Should either Party refuse or neglect to appear or participate in the arbitration proceeding, the arbitrator is empowered to decide the claim or controversy in accordance with the evidence presented. [Doc. 30-1, ¶25].

The parties agreed, upon execution of the Agreement, that Judgment could be entered on any arbitrator's award by any court having jurisdiction. Redhawk argues and N95 Shield does not dispute that this Court has the power to enter Judgment confirming the arbitration award under Section 9 of the FAA. The Arbitrator's Award was entered on May 1, 2023, and Redhawk's Petition was timely filed within the one-year statutory period to seek confirmation.

Redhawk argues that the Agreement was breached on June 23, 2021, when N95 Shield failed to transfer $9.5 million into a designated escrow account as required under Section 3.2 of the Agreement.[1] Redhawk further contends that N95

---

[1] Section 3.2 provides:

> **3.2** Within one (1) business day following execution and exchange of this Agreement, [N95 Shield] shall transfer … $9,500,000.00 into the Mosely & Lester Escrow Account pursuant to the Mosely and Lester Escrow Account Agreement, a copy of which is attached [to the Agreement].

Shield's default and failure to cure its default within ten business days of notice gave rise to Redhawk's contractual right to seek remedy in arbitration for breach of contract.

On May 20, 2022, Redhawk filed a Request for Arbitration with Judicial Arbitration and Mediation Service ("JAMS"). [*See* Final Award, Doc. 30-30, p. 4]. On June 7, 2022, Redhawk served the Request for Arbitration on N95 Shield by mailing a copy of the Request to N95 Shield at 1635 Orange Wood St., Gilbert, Arizona, 85296 (the "Gilbert Address"). [*Id.* at pp. 4-5; *see also* Doc. 30-8]. An arbitration hearing was conducted by retired judge Michael Messengale on February 22, 2023, [Doc. 30-30, p. 8], and an Interim Award and Order was issued on March 9, 2023. [Doc. 30-26]. No appearance was made by or on behalf of N95 Shield during the entirety of the arbitration proceedings.[2] A Final Award, issued on May 1, 2023, awarded the following amounts to Redhawk: (i) damages for breach of contract in the amount of $44,950,000.00; (ii) attorneys' fees in the amount of $32,571.55 and costs in the amount of $36,042.76; (iii) pre-award interest in contract damages in the amount of $3,365,092.47; and (iv) post-award interest on the sum awarded for contract damages, attorneys' fees and costs in a total amount to be determined at the time of payment or the entry of an order confirming the award. [Doc. 45-2]. The Final Award was mailed to N95 Shield on May 1, 2023, at

---

[Doc. 30-1, ¶3].

[2] Reference is hereby made to this Court's Memorandum Ruling denying N95 Shield's Motion to Vacate Arbitration Award [Doc. 40], which sets forth in detail the attempts made by Redhawk to provide N95 Shield with notice of the arbitration proceedings.

the Gilbert Address. [Doc. 30-29]. N95 Shield did not appeal nor seek to vacate, modify, or correct the Arbitrator's Final Award or Order within the time delays set forth in 9 U.S.C § 12.

On August 2, 2023, Redhawk filed the instant lawsuit, petitioning the Court for confirmation of the Final Award and entry of judgment against N95. [Doc. 1]. On November 17, 2023, N95 Shield filed a Motion to Vacate Arbitration Award, seeking to vacate the Final Award on grounds N95 Shield lacked notice of the arbitration proceedings and the arbitration was therefore improper. [Doc. 25]. After full briefing and oral argument, the Court denied the Motion, finding that service of all arbitration documentation was properly made on N95 Shield at the addresses contained in the Agreement; that N95 Shield had notice of the arbitration proceedings; and that N95 Shield was not denied due process. [Docs. 36; 40].

On April 19, 2024, Redhawk filed the instant Motion, seeking to confirm the Final Award [Doc. 45]. N95 Shield opposed the Motion on May 10, 2024 [Doc. 49]. All issues having been fully briefed, the Motion is now ripe for review.

LAW AND ANALYSIS

**I.    The Federal Arbitration Act**

Congress enacted the Federal Arbitration Act ("FAA") "to replace judicial indisposition to arbitration with a national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts." *21st Fin. Servs., L.L.C. v. Manchester Fin. Bank*, 747 F.3d 331, 335 (5th Cir. 2014), *citing Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581, 128 S.Ct. 1396, 170 L.Ed.2d 254

(2008) (alterations in original, citations and internal quotation marks omitted). Consistent with that policy, the FAA supplies "mechanisms for enforcing arbitration awards: a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." *21st Fin. Servs.*, 747 F.3d at 335. The FAA provides the exclusive remedy for challenging misconduct in the administration of an arbitration award. *Id.* at 335, *citing Ameser v. Nordstrom, Inc.*, 442 F. App'x 967, 970 (5th Cir. 2011). Under the FAA, a court's review of an arbitration award is "extraordinarily narrow," *Commc'ns Workers of Am., AFL-CIO v. Sw. Bell Tel. Co.*, 953 F.3d 822, 826 (5th Cir. 2020), *citing Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 471–72 (5th Cir. 2012), and "severely limited," *Manville Forest Prods. Corp. v. United Paperworkers Int'l Union, AFL-CIO*, 831 F.2d 72, 74 (5th Cir. 1987)—one of the most deferential standards "known to the law." *Cont'l Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 555 F.3d 399, 405 (5th Cir. 2009) (citation omitted). "The party defending against enforcement of the arbitral award bears the burden of proof." *YPF S.A. v. Apache Overseas, Inc.*, 924 F.3d 815, 819 (5th Cir. 2019), *citing Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 288 (5th Cir. 2004).

> 9 U.S.C. §9 states in relevant part:
>
> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such

application may be made to the United States court in and for the district within which such award was made.

The parties do not dispute that the instant Motion is timely filed and that this Court has jurisdiction to confirm the Final Award. N95 Shield argues that the Final Award should not be confirmed under 9 U.S.C. § 11(a), which allows a court to modify or correct an award "[w]here there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award." In a tortured interpretation of the Agreement, N95 Shield appears to be arguing that there was a "material miscalculation of figures" or an "evident mistake in the description of the thing or property referred to in the award," because the arbitration record does not include documentary evidence that Redhawk had procured the masks in question or would have been able to procure 500 million masks. Because of this alleged lack of evidence, N95 Shield argues that Redhawk's claim in arbitration was, in actuality, that it lost the "opportunity" to sell the masks. N95 Shield also urges that because the masks were not specifically manufactured or secured for N95 Shield, Redhawk could and should have mitigated its own losses by selling the masks to different purchasers. In this way, N95 Shield argues that there was a material miscalculation of figures by the arbitrator because the $45 million dollar damages award was based upon the erroneous fact of "lost opportunity."

But the arbitrator did not award damages for lost opportunity. Rather, the arbitrator properly construed Redhawk's claim in arbitration as a claim for breach of contract. Under Louisiana law, "[a]n obligor is liable for the damages caused by

his failure to perform a conventional obligation." La. Civ. Code art. 1994. "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." La. Civ. Code art. 1995. *See also Bank of the W. v. Prince*, 942 F.3d 697, 704 (5th Cir. 2019) (Article 1995 provides that "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived[,]" that is, "the amount [the obligee] would have lost in the event of a breach.").

Here, in his Final Award, the arbitrator set forth the relevant terms of the Agreement and found as follows:

> RedHawk seeks an award of damages in the amount of $45 million for breach of the Sales and Purchase Agreement. The dispute is governed by the substantive laws and procedural laws of Louisiana.
>
> Under Louisiana law, "[a]n obligor is liable for the damages caused by his failure to perform a conventional obligation." La. Civ. Code art. 1994. "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." *Id.* art. 1995.
>
> N95 Shield agreed in the Sales and Purchase Agreement to purchase 500 million masks at a total purchase price of $950 million. Under the arrangement agreed by the parties, within one business day following execution and exchange of the Agreement, N95 Shield was obligated to transfer $9.5 million into an escrow account.
>
> The Agreement was executed and mutually exchanged by use of the DocuSign platform, as indicated by the parties' electronic signatures on Exhibit A. N95 Shield failed to make the $9.5 million escrow deposit within one business day. Accordingly, N95 Shield defaulted on its contractual obligation. N95 Shield failed to cure its default within ten business days, which gave rise to RedHawk's contractual right to seek a remedy in arbitration for breach of contract.
>
> Under the arrangement agreed by the parties, RedHawk would have received a payment of $45 million, representing a $0.09/mask profit margin over the $1.81/mask acquisition price owed to a third party.

> Klug also testified that RedHawk would have incurred transaction costs, including overhead and legal fees of up to $50,000 to complete its obligations under the contract. Thus the expected benefit of the bargain or profit to RedHawk was $44,950,000.
>
> Accordingly, N95 Shield breached the Sales and Purchase Agreement, causing contract damages to RedHawk in the amount of $44,950,000. La. Civ. Code arts. 1994 & 1995.

[Doc. 45-2, pp. 10-11].

N95 Shield's argument that Redhawk did not perform its obligations under the Agreement because it did not "take a single step at that point or at any time to procure or manufacture any masks" and "never presented any masks for inspection" is both unpersuasive and materially inconsistent with the obligations of the parties under the Agreement. As the arbitrator found, under the clear and unambiguous terms of the Agreement, the transfer of N95 Shield's $9.5 million to the Mahler Law Group, PPLC ("Mahler") (3M Allocation holder) escrow account was a prerequisite to Mahler providing the proof of life ("POL") for the 1 billion mask lot, a report prepared by Society General De Surveillance, SA ("SGS"),[3] and batch numbers for the masks. [Doc. 45-4, 3.2-3.3]. Then, after independent verification by N95 Shield, N95 Shield was required to transfer the remaining purchase price to two designated escrow accounts. [*Id.*, 3.4-3.5]. Then, and only then, would Mahler allow access to N95 Shield to complete the physical inspection of the 3M Masks. [*Id.*, 3.6]. Because N95 Shield did not escrow the initial $9.5 million, Redhawk was not obligated to "perform" by providing an inspection of the 3M Masks at issue.

---

[3] SGS is a Swiss multinational company that provides inspection, verification, testing and certification services.

Considering the foregoing, N95 Shield's argument is unavailing, and N95 Shield has provided this Court with no evidence demonstrating that the May 1, 2023, Final Award of the arbitrator should be vacated, modified, or corrected under Sections 10 and 11 of the FAA.

## CONCLUSION

Considering the foregoing,

IT IS ORDERED that the MOTION TO CONFIRM ARBITRATION AWARD [Doc. 45] filed by Plaintiff Redhawk Medical Products & Services, LLC is GRANTED.

IT IS FURTHER ORDERED that the May 1, 2023, Arbitration Award is confirmed pursuant to Article 9 of the Federal Arbitration Act and Judgment is entered in favor of Plaintiff Redhawk Medical Products & Services LLC against N95 Shield, LLC in the amount of $44,950,000.00 in damages; attorneys' fees in the amount of $32,571.55; costs in the amount of $36,042.76; pre-award interest in the amount of $3,365,092.47; and post-award interest on the sum awarded for contract damages, attorneys' fees, and costs in an amount to be determined at the time of payment.

THUS, DONE AND SIGNED in Chambers on this 28th day of May, 2024.

                                        DAVID C. JOSEPH
                                        UNITED STATES DISTRICT JUDGE